**RECORD NO. 14-1484(L)**
**CROSS-APPEAL NO. 14-1536**

# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

IHFC PROPERTIES, LLC,

*Pl.-Appellee/Cross-Appellant,*

v.

WHALEN FURNITURE MANUFACTURING, INC.,

*Def.-Appellant/Cross-Appellee,*

and

APA MARKETING, INC.,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
HON. THOMAS D. SCHROEDER, U.S. DISTRICT COURT JUDGE

**OPENING BRIEF OF APPELLANT/CROSS-APPELLEE**
**WHALEN FURNITURE MANUFACTURING, INC.**

Randall S. Waier
LAW OFFICES OF RANDALL S. WAIER
20241 SW Birch Street, Suite 103
Newport Beach, CA 92660
(949) 476-2511 Telephone
(949) 476-3160 Facsimile
admin@waier.com

*Counsel for Appellant/Cross-Appellee*
*Whalen Furniture Manufacturing, Inc.*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1484__      Caption: IHFC Properties, LLC v. Whalen Furniture Manufacturing, Inc.; et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Whalen Furniture Manufacturing, Inc.
(name of party/~~amicus~~)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?   ☐ YES ☑ NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: ____June 3, 2014____

Counsel for: _Whalen Furniture Manufacturing, Inc._

## CERTIFICATE OF SERVICE
*****************************

I certify that on ____June 3, 2014____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Jeffrey T. Workman, Esq.
CONNORS MORGAN PLLC
609-B Eugene Court
Greensboro, NC 27401

_____              June ³, 2014
        (signature)                        (date)

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.......................................................  1

STATEMENT OF THE ISSUES.............................................................  2

STATEMENT OF THE CASE................................................................  2

      A.     STATEMENT OF THE FACTS........................................  7

SUMMARY OF ARGUMENT ............................................................  15

STANDARD OF REVIEW .................................................................  17

ARGUMENT ......................................................................................  17

      A.     The Statute Of Frauds Barred Any Enforcement Of
             Any Alleged Lease Or Lease Assignment Between
             IHFC And Whalen Furniture, And The District Court
             Erred In Viewing Brooks v. Hackney (1991)
             329 N.C. 166, 404 S.E.2d 854 As Precedent To Reject
             Whalen Furniture's Statute Of Frauds Defense .................  17

      B.     Whalen Furniture Merely Was A Sublessee Of APA
             Marketing, And Thus The District Court Erred In Awarding
             Judgment Against Whalen Furniture Under The
             APA Marketing Lease Because IHFC Lacked Privity
             Of Estate ..........................................................................  30

      C.     Predicated On Its Integrated And Expressed Factual
             Findings, The District Court's Award of $172,430.51
             Is Inconsistent, Inaccurate and Incorrect...........................  34

CONCLUSION ...................................................................................  37

STATEMENT REGARDING ORAL ARGUMENT ...........................  38

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...................  39

i

**TABLE OF CONTENTS**
(Continued)

CERTIFICATE OF SERVICE ................................................................. 40

ADDENDUM:  STATUTES INVOLVED ........................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*B&F Slosman v. Sonopress,Inc.,*
(2001) 148 N.C.App. 81 ...............................7, 18, 22, 23, 24, 25, 26, 27, 28, 30

*Brooks v. Hackney,*
(1991) 329 N.C. 166 ................................... 2, 6, 7, 16, 17, 18, 22, 23, 24, 25, 27

*C&H P'ship v. Shaw Indus. Group, Inc.,*
(MDNC 2006) 2006 U.S. Dist. LEXIS 27231 .................................  21

*Christensen v. Tidewater Fibre Corp.,*
(2005) 172 N.C.App. 575 ...........................................  16, 32, 33, 34

*Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C.,*
(1996) 124 N.C.App. 383 ....................................................  19, 29

*Famous Knitwear Corp. v. Drug Fair, Inc.,*
(1974) 493 F.2d 251..........................................................  17, 34

*Glassman Constr. Co. v. United States,*
(4th Cir. 1970) 421 F.2d 212 ...........................................  17

*Hall v. Misenheimer,*
(1904) 137 N.C. 183 .......................................................  20-21

*Harton v. Harton,*
(1986) 81 N.C.App. 295 ...................................................  19

*Herring v. Volume Mechandise, Inc.,*
(1958) 249 N.C. 221 .......................................................  19, 21, 28

*Raleigh Flex Owner I, LLC v. MarketSmart Interactive, Inc.,*
(MDNC 2011) 2011 U.S. Dist. LEXIS 22743 .................................7, 27, 29, 30

## TABLE OF AUTHORITIES
(Continued)

*Satterfield v. Pappas,*
   (1984) 67 N.C.App. 28 ........................................................ 21

*Yaggy v. B.V.D. Co.,*
   (1970) 7 N.C.App. 590 ...................................................... 21

## STATUTES

28 U.S.C. § 1291 ............................................................... 1

28 U.S.C. § 1332(a) .......................................................... 1

N.C. Gen. Stat. § 22-2 ......................................... 18, 20, 24, 30

# STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) ("diversity"). Plaintiff IHFC Properties, LLC ("IHFC") is a registered Delaware limited liability company authorized to transact business in North Carolina with its principal place of business in High Point, North Carolina. [JA 14; 20; 1289] Defendant Whalen Furniture Manufacturing, Inc. ("Whalen Furniture") is a registered California corporation in good standing with its principal place of business in San Diego, California. [JA 561, lns. 9-25; 526, lns. 1-12; 913; 1290] Defendant APA Marketing, Inc. ("APA Marketing") was, when IHFC's complaint was filed, a registered California corporation, with its former principal places of business in both Monument, Colorado and Irvine, California. [JA 698, lns. 10-25; 699, lns. 1-17; 715, lns. 18-25; 716, lns. 1-5; 1290] The amount in controversy exceeded $75,000.00. [JA 14-20]

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The district court entered the judgment from which appeal No. 14-1484 was taken on January 14, 2014. [JA 10, Doc. #57] Then, Whalen Furniture filed a motion to alter the judgment and amend the district court's findings on February 11, 2014. [JA 10, Doc. # 58, 59] The district court entered an order denying this motion on April 22, 2014. [JA 11, Doc. #65] Defendant Whalen Furniture timely filed its Notice of Appeal, on May 21, 2014. [JA 11, Doc. # 66] IHFC timely filed its Notice of

Appeal from the judgment on June 4, 2014, designated appeal No. 14-1536.  [JA 11, Doc. # 69]  This Court, on its own motion, consolidated the appeals as cross-appeals, whereby Whalen Furniture was denominated the appellant.  [JA 11, Doc. #72]

## STATEMENT OF THE ISSUES

Whalen Furniture challenges the district court's judgment, findings and legal conclusions on the following distinct issues in its petition for appeal.

1.     Whether the district court, in its application and analysis of *Brooks v. Hackney* (1991) 329 N.C. 166, 404 S.E.2d 854, erred in rejecting Whalen Furniture's statute of frauds [N.C.Gen.Stat. § 22-2] defense "on the basis of quasi estoppel."

2.     Whether the district court erred in tacitly not concluding that Whalen Furniture was an oral sublesee of APA Marketing under the APA Marketing lease.

3.     Whether the district court's award in favor of IHFC of $172,430.51 was overstated.

## STATEMENT OF THE CASE

In November 2006, APA Marketing, as lessee, and IHFC, as lessor, entered into a commercial 5 year lease ("APA Marketing lease") for a 15,005 sq. foot showroom on the fifth floor at the International Home Furnishings Center in High Point, North Carolina ("APA Marketing showroom").  [JA 809-817; 1290]  The

APA Marketing lease required APA Marketing to pay biannual installments of its

yearly rental, which reflected the twice-yearly High Point furniture markets

happening each April and October.  [JA 1291]  Less than 2 years into its term,

APA Marketing, by way of an asset purchase contract, sold the majority of its

inventory, its tradenames, including "APA", and customers to Whalen Furniture.

[JA 824-863, 1293; 1294]  APA Marketing remained operational following the

asset sale, collecting sizable account receivables and selling off a small portion of

its furniture inventory Whalen Furniture did not purchase.  [JA 700, lns. 4-19; 713,

lns. 5-25; 714, lns. 1-12; 1294; 1295]  In transitioning APA customers to Whalen

Furniture, and with the oral permission of APA Marketing, Whalen Furniture,

without a written lease with or written consent by IHFC, occupied 2/3rds of the

APA Marketing showroom, as "APA by Whalen," for two furniture market

intervals, October 2008 and April 2009, and accessed its portion of the APA

Marketing showroom for an off-market private meeting with one of its customers,

Macy's, in July 2009.[1]  [JA 718, lns. 6-25; 720, ln. 25; 721-728, lns. 1-11; 1291;

1292]  When APA Marketing became financially strapped, Whalen Furniture, after

the asset sale, paid a portion of APA Marketing's October 2008 market rent and all

---

[1]      At trial, Tom Loney, IHFC's leasing vice-president, testified that it was not
"permissible" for APA Marketing to assign its interest in the APA Marketing lease
without IHFC's "written consent."  [JA 216, lns. 13-21]

3

of its April 2009 market rent.  [JA 224, lns. 18-22; 230, ln. 21- 231, ln. 24][2]  The other 1/3rd of the APA Marketing showroom, which Whalen Furniture did not occupy, had been orally sublet by APA Marketing to and was occupied by Ultimate Accents, Inc., with the verbal consent of IHFC.  [JA 214, ln. 5- 215, ln. 18; 1292]  Ultimate Accents paid its sub-rent directly to APA Marketing.  [JA 215, lns. 16-18; 1292]  Ultimate Accents had its own entrance to its separate portion of the APA Marketing leasehold, which was separated by a wall from the APA Marketing side of the showroom.  [JA 213, ln. 7- 215, ln. 2]  Ultimate Accents was not listed as a tenant in the APA Marketing lease.  [JA 809-817]  Whalen Furniture vacated its occupation and use of its portion of the APA Marketing showroom in early August 2009.  [JA 239, ln. 15-240, ln. 17; 1304]

In the district court action, IHFC sought to hold Whalen Furniture accountable, after it vacated, for the remainder of the entire rental obligation of APA Marketing under the APA Marketing lease, contending that Whalen Furniture assumed, and thus succeeded APA Marketing as the lessee under, the APA Marketing lease, by the express terms of the asset purchase agreement.  [JA 14-20]

---

[2]     The invoices for these biannual rents were sent to APA Marketing, Inc., not Whalen Furniture, at its office in Monument, Colorado.  [JA 231 – As Loney testified, "[t]hat's where the tenant tells us they want their rent invoices sent." They only tenant on the APA Marketing lease was APA Marketing, Inc., not Whalen Furniture nor Ultimate Accents.]

IHFC also asserted that Whalen Furniture was a "mere continuation" of APA Marketing under a successor liability theory.  [JA 14-20]

Whalen Furniture asserted as a defense, and by way of its FRCP 52(c) motion made during trial, that the North Carolina statute of frauds, as a matter of law, barred enforcement of the APA Marketing lease, since there was no written lease between IHFC and Whalen Furniture, and there was more than three years left on the APA Marketing lease, when it moved into the APA Marketing showroom.  [JA 21; 26; 87, fn. 3; 98-101; 140; 151-160; 498-532; 1328 – "The Lease does not satisfy the writing requirement because … [it] was not signed by Whalen, the party to be charged.  There is therefore no writing that satisfies the statute of frauds."]  Whalen Furniture also contended that its relationship with APA Marketing, like that of the verbal arrangement of Ultimate Accents, was that of a sublessee, since it occupied less than the entire leasehold, and thus IHFC did not have the requisite privity to hold Whalen Furniture liable for the APA Marketing lease obligations.  [JA 87, 515-518; 1292]

By its judgment and memorandum opinions, the district court found in favor of Whalen Furniture under all of IHFC's *pleaded* theories of recovery.[3]  [JA 1319

---

[3]    In its memorandum opinion and order, the district court legally concluded that IHFC "failed to establish by a preponderance of the evidence that the parties to the [asset purchase agreement] intended to transfer the [APA Marketing lease] and its obligations at the time" [JA 1315-1316, ellipses added for clarity], and "Whalen [Furniture] was not the mere continuation of, nor did Whalen's [asset purchase

– "Whalen did not assume the Lease through mere continuation, *de facto* merger, or the Purchase Agreement."]

The district court however awarded judgment of $172,470.51 against Whalen Furniture and in favor of IHFC, concluding that Whalen Furniture, by occupying a portion of the APA Marketing showroom for less than a year, without a written lease after the asset sale, using utilities in the showroom, and conducting the private one-day showing of its merchandise to one of its customers between furniture markets, "accepted the benefits" of the APA Marketing lease, and thus was equitably estopped to deny liability for all of the remaining rental obligations of APA Marketing, including that portion of the showroom occupied by Ultimate Accents, less mitigation credits for rental income IHFC received from other tenants occupying the APA Marketing leasehold during the last two years of the APA Marketing lease term.  [JA 1319-1331]  The district court legally concluded that Whalen Furniture was estopped, *under an unpleaded quasi-estoppel theory*,[4] from asserting a statute of frauds defense, viewing the opinion of *Brooks v. Hackney*

---

agreement] effect a de facto merger with, APA Marketing, Inc.  Consequently, neither theory can serve as a basis for holding Whalen liable under the [APA Marketing lease]."  [JA 1319, ellipses added for clarity.]  By this appeal, Whalen Furniture does not challenge these well-reasoned and fact supported legal conclusions.  Whalen Furniture thus will limit discussions to the issues outlined above.

[4]    JA 515, ln. 9- 517, ln. 24.

(1991) 329 N.C. 166, 404 S.E.2d 854 ("*Brooks*") as determinative.  [JA 1319-1331; 1332][5]

The district court, by rendering a judgment in favor of IHFC under the quasi-estoppel theory, also tacitly concluded that Whalen Furniture was not a sublessee of APA Marketing.  [JA 519, lns. 17-19 – "THE COURT:  The sublease question is out the door as far as I am concerned."]

A.      STATEMENT OF THE FACTS

On November 1, 2006, APA Marketing entered into a 5 year written commercial lease with IHFC for the APA Marketing showroom.  [JA 809-817; 1290]  APA Marketing was an importer of casual dining and entertainment furniture for retail.  [JA 1290]  By its terms, the APA Marketing lease terminated on October 14, 2011.  [JA 817; 1290]  The annual rent for the showroom was to be

---

[5]      Whalen Furniture parried at trial that *Brooks* was factually distinguishable and legally irrelevant.  In its FRCP 52(c) motion [twice argued and taken under submission by the district court], Whalen Furniture argued that *B&F Slosman v. Sonopress, Inc.* (2001) 148 N.C.App. 81, 557 S.E.2d 176, 2001 N.C.App. LEXIS 1274 ("*B&F Slosman*"), and *Raleigh Flex Owner I, LLC v. MarketSmart Interactive, Inc.* (MDNC 2011) 2011 U.S. Dist. LEXIS 22743; 2011 WL 923356 ("*Raleigh Flex*") factually distinguished *Brooks*, and determined that quasi-estoppel was inapplicable to bar the application of a statute of frauds defense on a factual setting nearly identical to the undisputed facts established at trial.  [JA 151-160]  Whalen Furniture asserted that, unlike *Brooks*, and like the factual motif in *B.F. Slosman*, though it used a portion of the APA Marketing leasehold, there was *no written* lease or *written* consent by IHFC allowing it to do so, which were the only ways the APA Marketing lease could be modified to include Whalen Furniture as a tenant for the remaining term of the APA Marketing lease.  Whalen Furniture also argued that, like the defendant in *B&F Slosman,* it merely occupied a partial leasehold.

paid in equal installments due on April 15 and October 15 of each year to reflect the twice yearly High Point furniture market occurring each mid-April and mid-October.  [JA 223, lns. 13-20; 809; 810; 1291][6]  With the knowledge and oral permission of IHFC, APA Marketing orally sublet one-third of its showroom for a 5 year term to a separate and unaffiliated corporation, Ultimate Accents.[7]  [JA 700, ln. 20; 702, ln. 20; 706, ln. 10-708, ln. 3; 827, ¶ 2(k)]  Ultimate Accents imported furniture, but specialized in accent pieces, such as credenzas and end-tables.  [JA 1291]  Ultimate Accents thereafter paid for its one-third of the APA Marketing leasehold directly to APA Marketing.  [JA 708, lns. 1-3]  Ultimate Accents was listed separately on the IHFC directory as a tenant for the separated portion of the APA Marketing showroom it subleased.[8]  [JA 467, lns. 1-12]

Nearly 1 ½ years later, Whalen Furniture, in August 2008, purchased a majority of APA Marketing's assets, including inventory, and tradenames, such as

---

[6]     In its findings, the district court erroneously found the due dates to be May 1 and November 1.  [JA 1291]  However, at ¶ 3.0 of the APA Marketing lease, the due dates are April 15 and October 15.  [JA 810]

[7]     The shareholders of APA Marketing were Al Schwerin and Paul Coscarelli, and Ultimate Accents was owned by Gail and Ray Steele, Schwerin and Coscarelli. [JA 1291]

[8]     Edward Thomas, IHFC's former CFO, testified at trial that a written consent to an oral sublease arrangement between APA Marketing and Ultimate Accents was not needed because Ultimate Accents had the same owners as APA Marketing. [JA 467, lns. 13-17]  Upon further questioning, Thomas admitted that Ultimate Accents was a separate corporation from APA Marketing, having some different owners, officers, and directors.  [JA 467, ln. 1- 472, ln. 2]

"APA," through a written bulk asset sales transaction.[9]  [JA 824-863; 1293-1294]

At the time of asset purchase, the APA Marketing lease had over 3 years remaining

on its term.[10]  Following the asset sale, Whalen Furniture, with the oral

permission of APA Marketing, occupied only a portion of the APA Marketing

showroom until at least June or July 2009, without a written lease or the written

consent by IHFC.[11] [JA 472, ln. 25; 1327; 1328]  During Whalen Furniture's

---

[9]    Whalen Furniture paid $3.5 Million for the assets.  [JA 1293]  That left APA Marketing with $2.9 Million in accounts receivables to collect and pay off its other debts, including possibly its rental obligations to IHFC.  [JA 1227, lns. 9-18; 1295]

[10]    This was acknowledged by the district court, at ¶ 36, of its memorandum opinion.  The district court determined that "[a]t the time APA Marketing, Inc., [sic] conveyed its interest in the IHFC Lease to Whalen, more than three years remained on the Lease term."  [JA 1327, 1328]  In its opening statement, Sam Lasine, IHFC's attorney, conceded that "there was just over three years left on" the APA Marketing lease.  [JA 180, lns. 9-11]

[11]    IHFC contended at trial, and for the first time in its verified complaint, that Tom Loney, IHFC's former Vice-President of Leasing, and Tom Mitchell, CEO of IHFC, *orally* consented to an assignment of the APA Marketing lease to Whalen Furniture sometime before October 2008.  [JA 14, 16, 71, 72, 184]  First, there was no way they even knew that an alleged assignment could have occurred at that time.  Almost a year after this supposed October 2008 verbal consent, a dispute arose where Whalen Furniture attempted to remove its furniture samples from its portion of the APA Marketing showroom, only to be confronted by IHFC that the furniture samples could not be removed since they belonged to APA Marketing.  IHFC's attorney, Sam Lasine, wrote to Whalen Furniture's attorney, after receiving a copy of the asset purchase agreement for the first time, "[w]e are unconvinced concerning the ownership of the contents of the APA/Whalen showroom located at IHFC and whether *those contents are subject to the security interest granted to IHFC under the Lease of the showroom*."  [JA 936, 937, emphasis added]  Whalen Furniture never provided IHFC with the UCC-1 financing statement, which would have granted IHFC a "security interest" of any of the showroom contents belonging to Whalen Furniture.  APA Marketing however had provided the *only* "security interest" to IHFC.  [JA 272, ln. 7- 281, ln. 12]  *Nowhere in this letter*

occupation of the APA Marketing showroom, IHFC never opened a lease file for

Whalen Furniture, as it does for all of its tenants.  [JA 471, ln. 15- 473, ln. 5]

Thomas testified, at trial, in reviewing IMIS, a corporate generated informational

program under his charge as CFO, which program contained all information

relating to every tenant at the IHFC building, he saw "no notation or document or

other type of information on IMIS that would indicate Whalen Furniture … was

ever a tenant at IHFC."  [JA 472, ln. 25- 474, ln. 21]  He testified that IHFC, after

the asset sale, treated APA Marketing "as the actual tenant under the [APA

Marketing] lease."  [JA 474, lns. 18-21]  Whalen Furniture also was never listed as

a tenant on IHFC's rent rolls, after the asset purchase.  [JA 459, ln. 16- 460, ln. 24;

996-1006]

      After the asset sale, Loney, IHFC's former leasing vice-president, on

September 11, 2008, mailed to Ken Whalen, Whalen Furniture's president, sole

director and shareholder, a "Consent to Assignment of Lease" form.  In a cover

---

*does Lasine mention IHFC's oral consent of any assignment of the IHFC lease to
Whalen Furniture*, as a basis for IHFC's later stance that the APA Marketing lease
was assigned to Whalen Furniture by the terms of the asset purchase agreement.
Again, this was one year after Whalen Furniture began its occupation of only
2/3rds of the showroom.  Therefore, the evidence was patent, that *no* oral consent
to any alleged assignment could have been made prior to Lasine's August 2009
letter, because IHFC had not seen the terms of the asset purchase agreement before
that time.  [*Id.*]  You cannot consent to something you did not know about.  That
being said, the oral consent was never communicated to Whalen Furniture by
either Loney or Mitchell. [JA 304, ln. 15- 305, ln. 4; 359, lns. 16-20; 370, ln. 20-
385, ln. 8]

letter accompanying the form, Loney writes: "Please sign both copies of the assignment and the financing statement and return to this office with payment. We will finalize and return a copy for *attachment to the lease which is on file*. Due to the importance of a properly executed lease, please return the documents by Friday, September 19, 2008." [JA 985][12]

---

[12]      In this transmittal letter, Loney expresses IHFC needs the executed consent form to reflect "the change in ownership to Whalen Furniture Manufacturing, Inc." [JA 985] At trial, Loney testified that he had an early conversation with Ken Whalen before the October 2008 market, and after the consummation of the asset purchase. In that conversation, Loney congratulated Whalen on purchasing "APA." Loney recounted, in his first conversation with Whalen, that Whalen *never* said that Whalen Furniture "had assumed the lease," following the asset sale. [JA 265, ln. 2-272, ln. 2] Loney testified that IHFC, through his conversations with Paul Coscarelli, APA Marketing's former CFO, had "assumed" that Whalen Furniture "purchased" APA Marketing, Inc. [JA 271, ln. 13-272, ln. 6] Because of the assumption "Whalen had bought the company," Mitchell, IHFC's CEO, and the only officer at IHFC with authority to approve leases and lease assignments at the time, *orally* consented to Whalen Furniture "assumption of the APA Marketing lease." [JA 352, ln. 17-357, ln. 1; 360, ln. 8-365, ln. 1; 370, lns. 7-14] When cross-examined at trial, Mitchell testified that he did not communicate his verbal approval "to anyone at Whalen Furniture." [JA 359, lns. 16-24] Mitchell also testified that he did not waive the requirement in the APA Marketing lease requiring the written consent of IHFC to the APA Marketing lease assignment to Whalen Furniture. [JA 371, lns. 10-14] Mitchell finally testified that, "one of the conditions" to his verbal and uncommunicated approval of the assignment of the APA Marketing lease to Whalen Furniture was that Whalen Furniture was "purchasing APA Marketing, Inc." [JA 372, lns. 2-5] This did not happen – only assets were purchased. He also admitted that there was no written modification OF THE APA Marketing lease to show the changes in tenant from APA Marketing to Whalen Furniture. [JA 372, lns. 9-21] Mitchell testified that, if "APA Marketing, Inc.," the corporation, had not been purchased by Whalen Furniture, *he would not have orally approved the assignment*. [JA 372, lns. 2-8]

Whalen did not execute the form, or return either the form or financing statement as requested.  [JA 224, lns. 5-12]

On September 26, 2008, Whalen Furniture paid the remaining balance of $74,645.58 owed by APA Marketing for the October 2008 market under the APA Marketing lease, on APA Marketing's behalf.[13]  [JA 821; 1297]

During the October 2008 market, Whalen Furniture displayed and promoted its recently purchased APA Marketing branded merchandise at the APA Marketing showroom, under the tradename "APA by Whalen."  [JA 1298]

On November 14, 2008, Whalen Furniture paid the next rental installment of $119,430.41 under the APA Marketing lease.  [JA 823; 1299]

On December 18, 2008, Loney, by next day air shipment, forwarded another assignment consent form to Whalen, advising Whalen to "sign both copies of the assignment and the financing statement and return to this office…."  We will finalize and return a copy for attachment to the lease which is on file.  Please return the documents by Wednesday, December 31, 2008."  [JA 271, ln. 13-275, ln. 7; 987]

---

[13]      Coscarelli testified that he asked Ken Whalen to make the payment for the spring 2009 market when APA Marketing, Inc. was warned that it was late in paying for the payment.  He testified that Ken Whalen "took it under advisement."  [JA 724, ln. 9-726, ln. 18]  Coscarelli also testified that, in his conversation with Ken Whalen, he expressed urgency in that, without Whalen Furniture's lease payment under the invoice directed only to APA Marketing, Inc., APA by Whalen division had no place to show furniture.  [JA 725, lns. 16-25]

Whalen did not execute the form, or return either the form [JA 278, ln. 23-280, ln. 23; 1297; 1299] or the UCC-1 financing statement as requested.  [JA 272, ln. 7- 277, ln. 21]  Whalen Furniture furthermore did not provide IHFC with a certificate of insurance, naming it as an additional insured, as mandated by the APA Marketing lease.  [JA 281, ln. 7- 282, ln. 23; 812, ¶ 10.0][14]

At trial, Loney explained that the operational procedure for approving leases and lease assignments was to send out two copies to the prospective tenant, have the tenant return the executed documents, then Mitchell would execute both copies and send one back.  Once, the documents came back from the tenant signed, "they had a deal."  [JA 259, ln. 17-265, ln. 25][15]

---

[14]     Mitchell testified at trial that it was "important" and a condition of the APA Marketing lease that Whalen Furniture provide insurance coverage, naming IHFC as an additional insured.  [JA 360, ln. 25-362, ln. 11]

[15]     To summarize the importance of the lease and lease assignment approval process, before any lease or lease assignment became effective, Mitchell had to execute the lease or lease assignment form.  [JA 680, ln. 20- 692, ln. 5]  Mitchell reviewed all leases and lease assignment forms requiring his signature.  [JA 264, ln. 11- 265, ln. 28; 368, ln. 16- 372, ln. 21]  Upon his review, he had the *only* IHFC authority to sign or not to sign.  [JA 364, ln. 11- 365, ln. 11; 384, ln. 22- 385, ln. 8]  *There never was any written modification to the APA Marketing lease, replacing APA Marketing with Whalen Furniture, as lessee*, and executed by either IHFC, APA Marketing or Whalen Furniture.  [JA 314, ln. 9- 315, ln. 10; 316, ln. 22- 317, ln. 7; 362, ln. 24- 365, ln. 11; 435, ln. 14- 438, ln. 9]  The additional "importance" of having prior *written* consent of a lease assignment was "to show that the landlord actually consented to the assignment."  [JA 364, lns. 8-15]  Though Loney testified that IHFC gave oral approval to the lease assignment, no such approval by IHFC was ever communicated to Whalen Furniture.  [JA 304, ln. 19- 305, ln. 4; 598, ln. 2-599, ln. 22]

At the April 2009 market, Whalen Furniture , again without a written lease or written consent by IHFC, used the APA Marketing showroom to display "APA by Whalen" furniture samples to the trade and its customers.  [JA 1299; 1300]

Following that market, neither APA Marketing or Whalen Furniture paid the next rental installment of $135,046.69 under the APA Marketing lease.[16]  Because of that, IHFC forwarded an invoice to APA Marketing, Inc., not Whalen Furniture, for a late penalty fee of $6,752.45.  [JA 925-926; 1301-1302]

In July 2009, Whalen Furniture, during the off-market, used the APA Marketing showroom for a private one-day showing of some of its furniture samples to Macy's, one of its customers.  [JA 1302]  In late July, after the Macy's private showing, Whalen Furniture told IHFC that it was vacating the showroom. [JA 1303-1304]  Whalen Furniture vacated the showroom in early August 2009. [JA 1304]  After Whalen Furniture's departure, IHFC, in an effort to mitigate, executed a new lease with Ultimate Accents for a portion of the APA Marketing leasehold, and then entered into written leases with other tenants to occupy the APA Marketing showroom for the remainder of the APA Marketing lease term. [JA 1304-1307]

---

[16]    There was no evidence at trial that IHFC invoiced either "APA Marketing, Inc." or Whalen Furniture for this rental payment.  If it did at all, it was likely invoiced only to "APA Marketing, Inc.", at its corporate headquarters, in that, following the failure to pay the October 2009 market cycle rent, IHFC forwarded an invoice for a late penalty to "APA Marketing, Inc.", not Whalen Furniture.  [JA 1301-1302]

IHFC thereafter filed this lawsuit on June 22, 2010.  A bench trial commenced before the Honorable Thomas D. Schroeder on October 7, 2013, and spanned three days ending on October 9, 2013.  [JA 8; 9]

During trial, and after IHFC rested, Whalen Furniture brought a FRCP 52(c) motion on partial findings.  [JA 8, Dk. #53]  After oral argument, the district court took the motion under advisement.

Following the close of evidence, the district court heard continued arguments on Whalen Furniture's FRCP 52(c) motion.  [JA 786-805]  The district court took the matter under submission.  [JA 797; 198]

On January 14, 2014, the district court issued its memorandum opinion and judgment.  [JA 10, Dk. # 56]  On February 11, 2014, Whalen Furniture filed a FRCP 52(b) motion, to Alter Judgment.  [JA 10, Dk. # 58, 59]  On March 22, 2014, the district court denied the motion, and confirmed its judgment.  [JA 11, Dk. # 65]  On May 21, 2014, Whalen Furniture appealed.  [JA 11, Dk. # 66]  On June 4, 2014, IHFC filed it cross-appeal.  [JA 11, Dk. #69]

## SUMMARY OF ARGUMENT

This Court should reverse the judgment of the district court against Whalen Furniture for multiple reasons.

*First*, the North Carolina statute of frauds, N.C. Gen. Stat § 22-2, barred enforcement of the APA Marketing lease as against Whalen Furniture.  The district

court erred in analyzing *Brooks* as legal precedence for its conclusion that Whalen Furniture was equitably estopped from asserting a statute of frauds defense.

*Second*, Whalen Furniture, by legal definition, was a sublessee of APA Marketing. The district court erred in concluding that there was no evidence supporting that theory. Under *Christensen v. Tidewater Fibre Corp.* (2005) 172 N.C.App. 575, Whalen Furniture, on the record, was a sublessee in that it orally occupied only a portion of the APA Marketing leasehold , and APA Marketing enjoyed a reversionary interest. As a sublessee, Whalen Furniture was legally immune from any suit by IHFC for enforcement of the APA Marketing lease.

*Third*, the damages awarded by the district court against Whalen Furniture were overstated. The district court found Whalen Furniture liable for $172,430.51, representing base rent, CPI and CAMs and other rental escalators over the remaining term of the APA Marketing lease after it vacated the tenancy. The district court determined that Whalen Furniture could not be held equitably accountable for lease obligations not specifically discussed with Ken Whalen by Loney. The only lease obligations specifically discussed with Ken Whalen by Loney were the length of the lease, when the rent payments were due, when the next rent payment for the October 2008 market would be paid, the termination date of the lease, and the rate per square foot of the leasehold. The calculation of CPI,

CAM charges and other rent escalators were not discussed by IHFC with Ken Whalen, yet they are included in the district court's judgment.

## STANDARD OF REVIEW

This Court reviews the district court's factual findings for clear error, and legal conclusions *de novo*. *Glassman Constr. Co. v. United States*, (4th Cir. 1970) 421 F.2d 212, 214; and *Famous Knitwear Corp. v. Drug Fair, Inc.,* 493 F.2d 251, 252- 253 ["clearly erroneous standard not applicable to a district court's erroneous view of the laws"]. By this appeal, Whalen Furniture challenges the district court's view of the applicable laws to its factual findings, and its factual findings relative to the judgment award.

## ARGUMENT

**A.** **The Statute Of Frauds Barred Any Enforcement Of Any Alleged Lease Or Lease Assignment Between IHFC And Whalen Furniture, And The District Court Erred In Viewing Brooks v. Hackney (1991) 329 N.C. 166, 404 S.E.2d 854 As Precedent To Reject Whalen Furniture's Statute Of Frauds Defense.**

In its Twelfth Affirmative Defense, Whalen Furniture raised the statute of frauds as a bar to the enforceability of the APA Marketing lease. [JA 26] In its memorandum opinion, the district court obliquely concluded that "Whalen

17

[Furniture] is estopped from asserting a statute of frauds defense," predicated on an "acceptance of benefit" theory.[17]  [JA 1328]

N.C. Gen. Stat. § 22-2 states:  "All … leases and contracts for leasing land … exceeding in duration three years from the making thereof, *shall be void, unless*

---

[17]  Essentially, the district court's legal conclusion of quasi-estoppel, i.e. "acceptance of benefits," under the facts here *eviscerates* North Carolina's statute of frauds relative to leases.  By way of hypothetical, suppose a landlord *orally* leases commercial space to a tenant, for more than 5 years, in direct contravention of N.C. Gen. Stat. 22-2.  There is no written memorandum, containing all the material terms of the oral lease, signed by the tenant.  The tenant thereafter occupies the leasehold, pays its rent when due, and uses utilities and air conditioning.  After one year, the tenant vacates, disavowing the oral lease as unenforceable and void.  *Under this hypothetical, the statute of frauds patently would apply* by the express strictures of N.C. Gen. Stat. 22-2.  This is the *B&F Slosman* directive.  Take the next hypothetical.  The landlord enters into a 5 year written lease with a tenant, a lease containing all material terms, and the tenant thereafter occupies the leasehold, uses utilities in accordance with all the material written terms of the lease, and pays the agreed upon rent.  Three years later, the tenant discovers that one of the written material terms of the lease, namely that the description of the leasehold in the written lease is slightly inaccurate, and then disavows the remaining written terms of the written lease for that reason only.  In other words, *the tenant is taking an inconsistent position with the written terms of a lease he executed*, and agreed to, on a technically, "faulty description."  This is the *Brooks* decision, finding quasi-estoppel to bar enforcement of the statute of frauds.  *That is the distinguishing factor between the two decisions, which renders the district court's analysis of and reliance on Brooks erroneous* under our circumstances.  In the second hypothetical, the tenant is taking an inconsistent position in disavowing all of the written terms of a *written and complete lease*, otherwise conforming to the statute of frauds.  In the first, the tenant's position is not inconsistent, since the oral lease is wholly violative of the statute of frauds.  None of the terms are written or complete. In essence, the district court, by its decision here, would sanction a landlord, which entered into an oral lease for more than 3 years with a tenant, to possibly make up oral and possibly undiscussed terms to hold the tenant liable, i.e., the amount of rent, etc.  This is exactly the importance of the statute of frauds – to protect tenants from such chicanery.

18

*said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized."* [emphasis added] Oral assignments of unexpired leases to continue more than three years are void. *Herring v. Volume Merchandise, Inc.* (1958) 249 N.C. 221, 225-227, 106 S.E.2d 197, 200.

The APA Marketing lease indisputably exceeded three years in duration at the time of the asset purchase and after APA Marketing abandoned its side of the APA Marketing leasehold. [JA 1327; 1328] *There was no lease, assignment or memorandum ever executed by Whalen Furniture [or IHFC] relative to Whalen Furniture's status as an assignee of the APA Marketing lease.* This is a finding of fact and legal conclusion that the district court acknowledged in its opinion:[18]

---

[18]    The district court, at ¶ 24 of its factual findings, also remarks that Ken Whalen never "inform[ed] IHFC that he rejected" the consent to assignment form. [JA 1320] Even if this is so, Ken Whalen was under no legal duty to convey any such rejection. See, *Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C.* (1996) 124 N.C.App. 383 ["Plaintiff has not cited any North Carolina cases which show … that defendants had a duty to disclose their leasing plans for the premises," citing *Harton v. Harton* (1986) 81 N.C.App. 295, 297-298. *The district court likewise in its findings did not cite any North Carolina precedence imposing on Ken Whalen such a duty*. The district court in subsequent findings eventually agreed that Whalen Furniture did not have such a duty. [JA 1377]

Ken Whalen however *did inform IHFC of Whalen Furniture's rejection by not* "return[ing]" the executed consent form and financing statement by September 19, 2008. On that date, Loney wrote to Ken Whalen, *at Whalen Furniture's corporate offices in San Diego, California,* requesting that he "sign both copies of the assignment and the financing statement *and return to this office with payment*." [JA 985] Loney then remarks, "[w]e [then] will *finalize* … the lease. Due to the importance of a properly executed lease, please *return* the document by Friday,

> "The Purchase Agreement does not satisfy the writing requirement because it does not contain the essential terms of the Lease assignment; indeed, it does not even mention the IHFC Lease.  The Lease does not satisfy the writing requirement because, although it contains all the essential terms, was not signed by Whalen, the party to be charges.  There is therefore no writing that satisfies the statute of frauds."  [JA 1328]

In order that a contract falling within the sphere of  N.C. Gen. Stat. § 22-2 to be enforceable, it must appear that *there is a writing* containing *expressly or by implication all the material terms of the alleged agreement* which must have been signed by the party to be charged.  *Hall v. Misenheimer* (1904) 137 N.C. 183, 183,

---

September 19, 2008."  [*Id*.]  *Thus, the only mode of acceptance conditioned by Loney was a "return" by Ken Whalen of both the executed consent form and financing statement, which did not occur.*  This, unlike what the district court found, should have put IHFC "on notice" of Whalen Furniture's rejection. *Thereafter Whalen Furniture belatedly did make the April 2009 market payment on November 14, 2008.* [JA 823]  Notwithstanding receipt of that payment, Loney again forwarded a letter on December 18, 2008, with another unexecuted consent form to Ken Whalen, *to Whalen Furniture's corporate offices in San Diego, California*.  [JA 987]  Containing the same terms as in his September 11, 2008 letter, Loney's letter conditioned IHFC's lease assignment consent to a "return" of the executed consent form and financing statement *by December 31, 2008, before the assignment would be "finalized*."  [*Id*.]  Ken Whalen again tacitly responded *by not returning the consent form and financing statement signed as required. Therefore, nothing Ken Whalen did was inconsistent with Whalen Furniture's intention not to be responsible for the obligations of the APA Marketing lease.* When the executed consent form and financing statement were not forthcoming, *and after the rent of $119,430.41 for the April 2009 market was paid on November 14, 2008*, by Whalen Furniture, IHFC logically was aware that Whalen Furniture did not intend to occupy and use the APA Marketing showroom *after the April 2009 market*, and did not intend to continue to pay APA Marketing's remaining lease obligations, especially after Whalen Furniture did not timely execute and "return" the second consent form by December 31, 2008, and failed to timely pay the next biannual lease payment by May 1, 2009 for the October 2009 market.

188, 49 S.E. 104, 105-106; *Yaggy v. B.V.D. Co.* (1970) 7 N.C.App. 590, 599-600,

173 S.E.2d 496, 502; and *Satterfield v. Pappas* (1984) 67 N.C.App. 28, 35, 312

S.E.2d 511, 515-516.  Here, as acknowledged by the district court, there was no

evidence of a writing containing *all* of the material terms of any alleged lease for

the APA showroom *executed by Whalen Furniture*.  [JA 1328]

    In *C&H P'ship v. Shaw Indus. Group, Inc.* (M.D.N.C. 2006) 2006 U.S. Dist.

LEXIS 27231, *the district court* for the Middle District of North Carolina

observed:

> "It has long been the law of North Carolina that assignments of leases fall under the statute of frauds and that lease periods and times covered by options to renew count in determining the length of the lease. *Herring v. Volume Merchandise, Inc.*, 249 N.C. 221, 225, 106 S.E.2d 197, 200 (1958) (assignments of leases for more than three years must be in writing); *Wright v. Allred*, 226 N.C. 113, 114, 37 S.E.2d 107, 108 (1946) (optional renewal periods are counted).
>
> * * *
>
> In North Carolina, it is permissible for several documents to be used together to satisfy the statute of frauds. *Satterfield v. Pappas*, 67 N.C. App. 28, 35, 312 S.E.2d 511, 516 (1984). However, not just any set of documents can be used to satisfy the statute. Instead, *each document in the series must meet the requirement that it be signed by the person to be held accountable* in connection with the document or by his representative. *Id.*; *Howlett v. CSB, LLC*, 164 N.C. App. 715, 719, 596 S.E.2d 899, 902(2004). *Also, each document must relate to the other documents and cannot predate the agreement being memorialized. Id.* at 721, 596 S.E.2d at 903. *Finally, the documents must contain the essential terms of the alleged agreement between the parties and the intent and obligation of the party to be bound. Id.* at 719, 596 S.E.2d at 902.

Here, the documents relied on by plaintiff do not meet these requirements. The lease agreement between NYCW and plaintiff and the stock agreement between NYCW and defendant both clearly predate the alleged assignment documents. *Also, the lease was not signed by defendant. Thus, to the extent plaintiff wants to use the terms of the lease to bind defendant, it may not do so. There can only be an assignment if defendant signed papers agreeing to be an assignee. The stock agreement required NYCW to obtain consent to the transfers from landlords such as plaintiff, but plaintiff was not a party to this document and it gave no rights to plaintiff.*

\* \* \*

When all is said and done, plaintiff has failed to produce either a single document or a series of documents that meets all of the requirements of the statute of frauds in order for the documents to constitute a contract." *Id.* at 7-9, 12. [emphasis added.]

*Here, Whalen Furniture never executed any lease or memorandum thereof with IHFC for the APA Marketing leasehold.* [JA 1328, ¶ 36]

In its memorandum opinion, the district court misapplied the facts of and erroneously relied upon the North Carolina Supreme Court's legal analysis in *Brooks v. Hackney* (1991) 329 N.C. 166, 404 S.E.2d 854 ("*Brooks*"), in concluding that Whalen Furniture was estopped to raise the statute of frauds as a defense. [JA 1320-1325; 1327-1329] In so doing, the district court misconstrued and failed to properly distinguish *Brooks* from the facts here, and discounted the *B&F Slosman v. Sonopress* (2001) 148 N.C.App. 81, 557 S.E.2d 176, 2001 N.C.App. LEXIS 1274 ("*B&F Slosman*"), opinion argued by Whalen Furniture at trial and in its FRCP 52(b) motion, that *B&F Slosman* was directly on point barring the

22

application of "quasi-estoppel.[19]  *B&F Slosman* involved a directed verdict

predicated on the defense of the statute of frauds *on a fact patterned almost*

*identical to the one here*.   In *B&F Slosman*, the parties had engaged in extensive,

but unproductive negotiations concerning terms of a warehouse lease.  *Although no*

*written lease ever was executed*, the defendant lessee, while occupying the

warehouse under the oral consent of the plaintiff landlord, prepared a document

entitled, "Negotiation Summary," *compiling the various options that had been*

*discussed during negotiations*, including plaintiff's "blended" lease offer *that the*

*defendant never accepted*.  When the defendant vacated the warehouse, the

plaintiff lessor sued for breach of lease, *quantum meruit*, and unfair and deceptive

---

[19]      At ¶ 31 of its opinion, the district court, in analyzing the *Brooks* facts, and
comparing those to the *B&F Slosman* facts, confusingly remarks that "the *Slosman*
tenant never accepted benefits from the agreement (i.e. never accepted benefits
over and above simply occupying the space and paying rent.  That is the essential
point of quasi-estoppel *and the critical fact distinguishing this case from Slosman*."
[JA 1325]  In making this finding, the district court, with all due respect, strains its
analysis by finding that "Whalen accepted utilities," which IHFC paid according to
the terms of the APA Marketing lease.  [Opinion, ¶ 27, pg. 37]  First, like the
defendant in *B&F Slosman*, Whalen Furniture did "occupy" the APA Marketing
portion of its leasehold for two markets; the other portion was occupied by
Ultimate Accents, pursuant to an oral arrangement with IHFC.  "Occupation" as
defined in Black's Law Dictionary, means *use* and possession over the premises.
Is the district court seriously contending that *use* of the leasehold premises does not
include the use of lights, elevator, heat, and air conditioning?  By occupying, was
Whalen Furniture not supposed to turn on the air conditioning?  In fact such
conduct would be diametrical to IHFC's requirement of its tenants to "use the
Premises for the display, exhibition, and sale" of furniture items, "to the extent
reasonably required for the conduct of such activities," and that during markets, the
tenants "must open the Premises, exhibit its products" etc. [JA 809; 811]

trade practices under North Carolina common and statutory law. Against the

breach of lease claim, the defendant raised the statute of frauds, *N.C. Gen. Stat. §*

*22-2* (1999), as an affirmative defense. The plaintiff countered by claiming that

the defendant should be estopped from using the statute of frauds, claiming the

defendant's "Negotiation Summary" constituted a memorandum sufficient to

satisfy the statute of frauds' writing requirement. The appellate court concluded

that the "Negotiation Summary" simply outlined the various stages in the

negotiation process and did not include any language signifying an intention on the

part of the [lessee] to be legally bound to a five-year lease. *Id.* at 148 N.C.App. 85,

557 S.E.2d at 179. Moreover, the appellate court found the "Negotiation

Summary" lacked mutuality of agreement and therefore did not amount to a

contract. *Id.*

     *B&F Slosman under these factual findings* and legal conclusions factually

and legally distinguished *Brooks*, and determined that quasi-estoppel did not

present a bar to the defendant's statute of frauds affirmative defense:

> "In support of its argument, plaintiff relies on our Supreme
> Court's decision in *Brooks v. Hackney*, 329 N.C. 166, 404
> S.E.2d 854 (1991). However, Brooks recognized the
> applicability of quasi- estoppel in a context *notably inapposite*
> *to the facts of this case. In Brooks, the parties had entered into*
> *a written agreement for the sale of real estate.* Over the course
> of eight years, *the plaintiff used the real estate and made*
> *monthly payments pursuant to the terms of the agreement.*
> However, after a disagreement arose, the plaintiff demanded the
> return of the monthly payments he had made over the previous

eight years, arguing that because the agreement did not clearly describe the real estate, it failed to satisfy the statute of frauds. Our Supreme Court agreed that the *written agreement* did not adequately describe the real estate but held that plaintiff was estopped from taking advantage of the faulty description. The Court stated: "It is well settled that 'a party will not be allowed to accept *benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement*.'" *Id*. at 173, 404 S.E.2d at 859, (quoting *Advertising, Inc. v. Harper*, 7 N.C. App. 501, 505, 172 S.E.2d 793, 795 (1970)).

*In contrast*, plaintiff, in this case, asserts that defendant, *in occupying the entire plant, received benefits it would have received under a written lease*.[20] *However, unlike Brooks, defendant did not execute a written agreement. Such a construction as plaintiff contends would conflict with the essential purpose of quasi-estoppel, which is to prevent a party from benefitting by taking two clearly inconsistent positions*. See *Carolina Medicorp v. Bd. of Trustees of the State Medical Plan*, 118 N.C. App. 485, 492, 456 S.E.2d 116, 120 (1995).

---

[20]    This was the key distinguishing fact in the two opinions, namely, in *Brooks*, there was an executed written purchase agreement, where the plaintiff sought to disavow *all written material terms* of the contract, after he used the real estate pursuant to the "*written* agreement," on a written "faulty description," while in *B&F Slosman*, there was no written lease containing the material terms executed by the defendant, and whereby the defendant sought to dismiss those written material terms. The court in *Brooks* essentially said that the buyer, by entering into a *written* sale contract, encompassing admittedly an inadequate description of the property, was estopped to deny that he made a *written* deal to purchase the property, especially after he used the real estate by the other written terms. The *Brooks* court seemed to infer that, in this instance, it could legally reform the written contract to conform to the actual description of the realty from the plaintiff's actual use. The defendant in *B&F Slosman*, like Whalen Furniture, also "received benefits" in its occupation which it would have received had it executed a written lease. However, the difference between *Brooks* and *B&F Slosman* is that the defendant in *B&F Slosman* "did not execute a written agreement," containing all of the material terms; a key fact overlooked in the district court's memorandum opinion.

Here, defendant argues that the parties were only in the process of negotiating a lease for additional space. The fact that defendant *occupied* the additional space during the negotiation process *and agreed to pay a monthly rent does not result in defendant's taking two inconsistent positions.* See *Kent v. Humphries*, 303 N.C. 675, 679, 281 S.E.2d 43, 46 (1981) (holding when a tenant enters into possession under an invalid lease and tenders rent which is accepted by the landlord, a periodic tenancy is created and the period of the tenancy is determined by the interval between rental payments). Thus, we find no merit in plaintiff's quasi-estoppel argument. *Id*. at 88-89. (Emphasis and footnote added.)

IHFC, over an 8 month span, attempted to get Whalen Furniture to "finalize" the transaction, "return" an executed consent form and financing statement, when then signed by Mitchell, IHFC's president, would become an addendum to the IHFC lease. *That never occurred*, and Ken Whalen refused to execute any such consent or lease, just like the conduct of the defendant lessee in *B&F Slosman*. [JA 587, ln. 11-589, ln. 24] Though Whalen Furniture, like the defendant in *B & F Slosman*, paid rental payments and *occupied* a portion of the APA Marketing leasehold, Whalen Furniture "did not execute a written agreement," containing all of the material terms, with IHFC. Thus, as the court observed about the defendant in *B&F Slosman*, Whalen Furniture has *not* taken two inconsistent positions under these circumstances.[21] Accordingly, the district court's erred in concluding that

---

[21] Furthermore, the district court strains its analysis by finding that "Whalen accepted utilities," such as lights and air conditioning, which IHFC paid according to the terms of the IHFC Lease. [JA 1322; 1323] First, like the defendant in *B&F Slosman*, Whalen Furniture did "occupy" the APA Marketing leasehold for two

quasi-estoppel barred Whalen Furniture's statute of frauds defense, relying on its

faulty interpretations of the *Brooks* and *B&F Slosman* opinions, and its erroneous

view of the scope of North Carolina's statute of frauds.

In accord, see *Raleigh Flex Owner I, LLC v. MarketSmart Interactive, Inc.*

(MDNC 2011) 2011 U.S. Dist. LEXIS 22743; 2011 WL 923356.  In *Raleigh Flex*,

this Court, on a similar factual setting as here, cited with approval the *B & F*

*Slosman* decision, and discussed when "quasi estoppel" would or would not apply:

> "More specifically, the parties' dispute on this claim turns on
> whether the equitable doctrine of "quasi-estoppel" (sometimes
> called "estoppel by acceptance of benefits") - as the North
> Carolina Supreme Court has construed or will construe it -
> makes Defendant MSA liable under the Lease *despite the fact*
> *that Defendant MSA never became a signatory to the Lease (or*
> *any assignment thereof)*.  (See id.)  The North Carolina
> Supreme Court has recognized the concept of liability by quasi-
> estoppel and has characterized the theory as one by which "a
> party who accepts a transaction or instrument and then accepts
> benefits under it may be estopped to take a later position
> inconsistent with the prior acceptance of that same transaction
> or instrument."  *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1,
> 18, 591 S.E.2d 870, 881-82 (2004) (citing *Brooks v. Hackney*,

markets.  "Occupation" as defined in Black's Law Dictionary, means use and
possession over the premises.  Was the district court seriously contending that *use*
of the leasehold premises does not include the use of lights and air conditioning?
By occupying, was Whalen Furniture not supposed to turn on the lights and air
conditioning?"  In fact, such conduct would be diametrical to IHFC's requirement
of its tenants to "use the Premises for the display, exhibition, and sale" of furniture
items, "to the extent reasonably required for the conduct of such activities," and
that during markets, the tenants must open the Premises, exhibit its products" etc.
[JA 811]  Also, despite what the district court found, the APA Marketing lease, at ¶
4.1, did allow IHFC tenants to use their leaseholds during off market times.  [JA
811]

329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991)) (emphasis added). Said court further has explained that "'the essential purpose of quasi-estoppel is to prevent a party from benefitting by taking two clearly inconsistent positions.'" *Id*., 358 N.C. at 18-19, 591 S.E.2d at 882 (quoting *B & F Slosman v. Sonopress, Inc.*, 148 N.C. App. 81, 88, 557 S.E.2d 176, 181 (2001)) (internal ellipses omitted) (emphasis added).

In this case, *Plaintiff has presented no evidence that Defendant MSA "accept[ed]" the Lease (or an assignment thereof) "and then accept[ed] benefits under [the Lease]*," *id*., 358 N.C. at 18, 591 S.E. 2d at 882. Nor has Plaintiff produced proof that Defendant MSA previously "benefitt[ed] by taking," *id*., a position inconsistent with its current denial of liability under the Lease. Accordingly, under the dictates of the North Carolina Supreme Court, the doctrine of quasi-estoppel does not preclude Defendant MSA from denying liability for the Lease.

In an effort to avoid this conclusion, Plaintiff has listed various items of evidence "establish[ing] that [Defendant] MSA considered itself to be the tenant of the [Premises] under the Lease with corresponding rights (and obligations) as a tenant" (Docket Entry 68 at 19-20). As *Defendants have countered, however, most of this evidence only shows that Defendant MSA occupied the Premises and paid rent on a monthly basis in the amount prescribed by the Lease*. (See Docket Entry 73 at 13-14.) This showing does not suffice because, under North Carolina law, Defendant MSA's occupancy of the Premises while paying rent did not constitute a "benefit" *derived from the Lease*.

*Under the Lease (and North Carolina law, see Herring, 249 N.C. at 225-27, 106 S.E.2d at 200-01), Defendant MSA could not assume Defendant MSI's position as a tenant under the Lease, except pursuant to a written assignment*; as Plaintiff's First Amended *Complaint makes clear (see Docket Entry 47 at 8), no such assignment ever occurred*. As a result, when Defendant MSA took possession of the Premises and began making monthly payments which Plaintiff accepted, Defendant MSA did not become a valid party to the Lease (or a party to

28

any lease); instead, Defendant MSA effectively moved in to the Premises *pursuant to an invalid assignment of Defendant MSI's rights under the Lease* - an arrangement to which Plaintiff acquiesced by accepting monthly rental payments from and on behalf of Defendant MSA. Under North Carolina law, "when a tenant enters into possession under an invalid lease and tenders rent which is accepted by the landlord, a periodic tenancy is created. . . . The period of the tenancy is determined by the interval between rental payments. In this case a month-to-month tenancy was created." *Kent v. Humphries*, 303 N.C. 675, 679, 281 S.E.2d 43, 46 (1981)." *Id.* at *27. (emphasis added.)

Like the plaintiff in *Raleigh Flex*, IHFC only offered evidence that Whalen Furniture "occupied" the leasehold and made two rental payments. As this district court remarked in *Raleigh Flex*, occupation and the payment of rent do not "constitute a 'benefit' derived from the Lease." *Id*.

See also: *Computer Decisions v. Rouse Office Mgmt.* (1996) 124 N.C.App. 383, 388, 477 S.E.2d 262, 1996 N.C.App. LEXIS 1054 ["Plaintiff asserts that the 15 December 1992 internal form and a draft lease dated 18 December 1992 (draft lease) are sufficient to satisfy the statute of frauds. *We disagree because these writings fail to show contract formation*." Just like in *Computer Decisions*, there was no writing or writings or other testimony admitted into evidence "show[ing] contract formation." To emphasize, there was no writing, or a series of writings, *executed by Whalen Furniture*, which contained *all* the material terms of the APA Marketing lease. Since there was no "valid" lease entered into between IHFC and Whalen Furniture for the APA Marketing showroom, and Whalen Furniture only

29

occupied a portion of the APA Marketing leasehold under oral consent, the North Carolina statute of frauds, N.C. Gen. Stat. § 22-2 applies, barring IHFC's enforcement of the APA Marketing lease obligations against Whalen Furniture.

This Court reviews the district court's legal conclusions and judgment *de novo*, since the district court erred by its erroneous view that quasi-estoppel, i.e. acceptance of benefits, estopped Whalen Furniture from asserting its statute of frauds defense. Predicated on the holdings in *B&F Slosman* and *Raleigh Flex*, the district court should have concluded that IHFC was barred from enforcing the APA Marketing lease rental obligations as to Whalen Furniture.

**B.     Whalen Furniture Merely Was A Sublessee Of APA Marketing, And Thus The District Court Erred In Awarding Judgment Against Whalen Furniture Under The APA Marketing Lease Because IHFC Lacked Privity Of Estate.**

In its memorandum opinion, the district court acknowledged that APA Marketing "shared the IHFC showroom space with Ultimate Accents," with Ultimate Accents occupying about 5,000 sq. ft., and the Ultimate Accents space was partitioned from the APA Marketing showroom. [JA 1291; 1292, ¶ 21; 1298] Under this arrangement, APA Marketing was the *only* lessee on the APA Marketing lease. [JA 1292] APA Marketing only had a verbal agreement with Ultimate Accents for its use of a portion of the APA Marketing leasehold.

30

Ultimate Accents paid APA Marketing directly for its rent of its use of the subleasehold.  [JA 1292]  Ultimate Accents was not invoiced by IHFC, for its occupation and use.  [JA 818; 822]

At trial, and in its trial brief, Whalen Furniture asserted that it also was merely an oral sublessee of APA Marketing after the asset sale.  [JA 87; 93; 198 lns. 5-16]  After the asset sale, Whalen Furniture occupied and used only 10,000 sq. ft. of the 15,005 sq. ft. APA Marketing leasehold.  [JA 1290; 1291-1292][22]

In its legal conclusion, the district court inferentially found that IHFC waived the APA Marketing lease provision requiring an approved written sublease before Ultimate Accents could occupy APA Marketing, Inc.'s space, tacitly finding that the "verbal arrangement" between APA Marketing and Ultimate Accents to be an oral sublease.  [JA 1292]  *The district court never addressed Whalen Furniture's asserted issue that it was only an oral sublessee of APA Marketing*,

---

[22]    In its opinion, the district court found that "Whalen used the IHFC Lease as if it were its own."  [JA 1298]  That is not so, and conflicts with the weight of the evidence.  One, after the asset sale, IHFC continued to invoice APA Marketing only for the biannual at its principal place of business in Monument, Colorado.  [JA 818-820; 822]  Two, Whalen Furniture only occupied 2/3rds of the APA Marketing showroom, while Ultimate Accents continued to occupy the other 1/3[rd] of the showroom pursuant to its verbal arrangement with APA Marketing.  [JA 1290-1292]  There was no evidence that Whalen Furniture ever entered into any leasing arrangement with Ultimate Accents.  Finally, when the rental payment under the IFHC lease became due on May 1, 2009, and the rent payment was not made, IHFC "issued a bill to *APA Marketing, Inc.* [not Whalen Furniture or Ultimate Accents] for a late penalty on July 22, 2009.  [JA 925; 926]

and thus IHFC had no privity of estate to sue Whalen Furniture.[23]  At trial and in

its FRCP 52(c) motion, Whalen Furniture argued that it, like Ultimate Accents,

*only* was a sublessee, legally immune from suit by IHFC under the APA Marketing

lease.  [JA 507, lns. 1-17]

In *Christensen v. Tidewater Fibre Corp.* (2005) 172 N.C.App. 575, the

plaintiff landlord brought suit to recover rent due under a written lease agreement

against a recycling corporation that was occupying the leasehold.  The recycling

corporation's *predecessor* had actually entered into the lease with the landlord.

The landlord had no knowledge of a purported assignment of the lease to the

recycling corporation *until it received a different rent check*.  The trial court

awarded the landlord unpaid rent against the recycling corporation.

On appeal, the recycling corporation asserted that it did not assume the

lease.  The appellate court concurred, and vacated the judgment awarding the

landlord the unpaid rent, property taxes or insurance under the lease.  *The appellate*

*court found no privity between the landlord and the recycling corporation.  The*

*appellate court also found, there was no agreement by the tenant to convey its*

---

[23]      Along these lines, IHFC did not sue Ultimate Accents in this litigation for
the remaining rent under the APA Marketing lease.  [JA 14]  Ultimate Accents is
and was in the same legal status as Whalen Furniture.  It had an oral arrangement
with APA Marketing to occupy a portion of the APA Marketing leasehold.  This
oral arrangement was orally approved by IHFC.  It paid its rental payments for the
portion of the leasehold it used.  [JA 2191; 1292]

*entire interest in the property, and concluded that the purported assignment was really a sublease.*

The central issue on appeal was whether the lease arrangement between the recycling corporation and its predecessor constituted an assignment or a sublease. The *Christensen* court acknowledged that a "bright line" test had been adopted by the North Carolina courts "in determining whether a conveyance by a tenant of leased premises is an assignment or sublease. [*Id*. at 586.] "[A] conveyance is an assignment if the tenant conveys his 'entire interest in the premises, without retaining any reversionary interest in the terms itself.' A sublease, on the other hand, is a conveyance in which the tenant retains a reversion in *some portion* of the original lease term, however short." [*Id*. emphasis added.]

Here, the district court determined that APA Marketing still retained a reversionary interest "in some portion of the" showroom, namely the Ultimate Accents side of the showroom. [JA 1291; 1292] APA Marketing still retained its verbal sublease with Ultimate Accents after the asset sale. There was *no* written agreement by APA Marketing specifically conveying its interest in the Ultimate Accents subleasehold to Whalen Furniture. [JA 824-863 – The asset purchase agreement does not even mention Ultimate Accents, except at ¶ 2(k), in regard to Schwerin's and Coscarelli's employment agreements with Whalen Furniture. [JA 827; 828.] Furthermore, Whalen Furniture's only oral agreement to use the APA

33

Marketing showroom was to display its wares in the APA Marketing showroom side.  [JA 1298; 1299-1300]

As a sublessee, "there was no privity of estate or contract between defendant [Whalen Furniture] and plaintiff [IHFC]," and "plaintiff [IHFC] had no recourse against defendant [Whalen Furniture] for any violations" of the IHFC lease. *Christensen*, 586, ellipses provided for clarity.

The district court thus erred in awarding IHFC damages against Whalen Furniture for unpaid rent of $172,470.51 under the APA Marketing lease in that there was no privity of estate between IHFC and Whalen Furniture.

This sublease issue presents a legal conclusion of the district court, which must be decided by this Court *de novo*.  The district court implies in its findings and judgment that Whalen Furniture was bound by some of the terms of the APA Marketing lease, for its limited and restricted use and occupation of less than all of the APA Marketing leasehold, tacitly concluding that Whalen Furniture was not a sublessee.  Accordingly, the district court's award was predicated on an "erroneous view of the laws."  *Famous Knitwear Corp.*, *supra* at 252-253.

**C.    Predicated On Its Integrated And Expressed Factual Findings, The District Court's Award of $172,430.51 Is Inconsistent, Inaccurate and Incorrect.**

At ¶ 41 of its opinion, the district court finds that "Whalen [should] be held accountable for the material terms of the Lease," – *only those terms however which had been "shown to have been discussed with Ken Whalen by Loney*." [JA 1327] In cross-examination, Loney testified he did not *specifically* discuss or mention CAM charges, the calculation of CPI or other rent adjustments with Ken Whalen; all material terms of the APA Marketing lease, since these constitute additional rental payments. [JA 279, ln. 17-281, ln. 12][24] On the strength of Thomas' testimony and his prepared "Summary Compilation And Analysis of IHFC's Lease" [JA 911-912], the district court awarded IHFC *$172,430.51* against Whalen Furniture. [JA 1330] At fn. 32, in its memorandum opinion, the district court noted that "Thomas testified at trial" to this damage amount, representing net rental owed under the APA Marketing lease. [JA 1330] However, Thomas' calculations

---

[24]     Loney testified twice that he *only* specifically remembered that he told Ken Whalen "the payment dates, when the semi-annual rent payment installments were due, the rate per square foot, and the termination date of the [APA Marketing] lease. [JA 280, lns. 2-16] The other occasion was on direct examination by Lasine. On direct, Loney explained that he told Ken Whalen the "length of the lease," the due dates of the rent payments, the "termination date of the lease," and "the rate per square foot that APA had signed for." [JA 223, lns. 19-20] These are not all the material terms of the APA Marketing lease, namely the location and square footage of the showroom space that Whalen Furniture actually would be occupying, the Ultimate Accents' leasing arrangement with APA Marketing [that it also was on oral co-lessee], the calculation of CPI, CAM charges, and other rent escalators, including the calculation of late fees, interest and assessments. Of course, in a deposition taken of Loney *a year earlier*, he could not recount any of the generalities *or even the specifics of that conversation*. [JA 268, ln. 24-272, ln. 2 – "I can't recount that conversation."]

of the $172,430.51, not only included the fixed annual rent, but *included CPI* escalations, CAM charges, and other rental adjustments *never* communicated to Ken Whalen by Loney.  [JA 911-912]  *These patently are and were material lease terms*, which should have been communicated to Ken Whalen.  And, by the terms of the APA Marketing lease, the CPI and CAM escalators and other rental adjustments could only be calculated in the future, by the methodology laid out in the APA Marketing lease; methodology not discussed by Loney with *Ken Whalen*. [JA 809-817 – Sections 3.3, rent adjustment; 8.0, taxes; 9.0, Utilities; 10.0, insurance; 12.3, late charges; 16.0(h), late fees; and 16.0(i), attorneys fees]  To have been consistent then with its factual findings, the district court *should have deducted* these additional amounts in Thomas' summary from the rental damages awarded.  In Thomas' calculations, he totaled $49,101.69 in actual CPI escalations after the April 2009 market, and $47,594.00 in CAM charges, equaling *$96,695.69*, which should have been deducted, *leaving the damages at $75,734.82*. This comports with the district court's expressed factual findings and conclusions at ¶¶ 41 and 42, of its memorandum opinion, that "[j]ustice requires that Whalen be held accountable for the material terms of the Lease:  rent owed over the balance of the Lease," however, such accountability only extends to "*specific* lease provisions ... shown to have been discussed with Ken Whalen."  [JA 1330; 1331, emphasis added.]

This Court reviews the district court's legal conclusions and judgment *de novo*, since the award was predicated essentially on undisputed facts, including the district court's findings that the calculation of CPI, CAM charges, attorneys fees, as well as late fees, were not discussed with Ken Whalen by Loney. This Court reviews the district court's finding that Loney did not discuss with Ken Whalen, terms such as interest and reasonable attorney's fees and expenses, and other rental escalators, under a "clear error" standard. This Court therefore should instruct the district court on remand to modify its judgment accordingly against Whalen Furniture to $75,734.82.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court's judgment, and remand to the district court to enter judgment in favor of Whalen Furniture. In the alternative, if this Court determines that liability on Whalen Furniture's part has been established under the "quasi-estoppel" theory, then this Court should reverse the district court's judgment and remand to the district court to enter a judgment of $75,734.82.

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents important issues relating to the application of North Carolina's statute of frauds to oral leases over 3 years in duration. The issues involved in this appeal are complicated, and, among other things, involve the district court's misinterpretation and misapplication of a decision of the North Carolina Supreme Court essentially nullifying the North Carolina statute of frauds with respect to oral leases over three years. As a result, oral arguments are warranted.

Respectfully submitted,

/s/ Randall S. Waier
Randall S. Waier
LAW OFFICES OF RANDALL S. WAIER
20241 SW Birch Street, Suite 103
Newport Beach, CA  92660
Telephone:  (949) 476-2511
Facsimile:    (949) 476-3160

*Counsel for Appellant and Cross-Appellee*
*Whalen Furniture Manufacturing, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____    Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines.  Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines.  Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]     this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]     this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]     this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]     this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

# CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____
       Signature                                    Date

## ADDENDUM:  STATUTES INVOLVED

Pursuant to Fed. R. App. P. 28(f), Whalen Furniture submits this addendum containing the relevant statute necessary to the resolution of the issues presented by this appeal.

N.C. Gen. Stat. § 22-2

## N.C. Gen. Stat. § 22-2

Statutes current through the 2013 Regular Session Annotations Current through June 6, 2014

*General Statutes of North Carolina*  >  *CHAPTER 22. CONTRACTS REQUIRING WRITING*

## § 22-2. Contract for sale of land; leases

All contracts to sell or convey any lands, tenements or hereditaments, or any interest in or concerning them, and all leases and contracts for leasing land for the purpose of digging for gold or other minerals, or for mining generally, of whatever duration; and all other leases and contracts for leasing lands exceeding in duration three years from the making thereof, shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized.

## History

29 Charles II, c. 3, ss. 1, 2, 3; 1819, c. 1016, P.R.; 1844, c. 44; R.C., c. 50, s. 11; 1868, c. 156, ss. 2, 33; Code, ss. 1554, 1743; Rev., s. 976; C.S., s. 988.